[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for return of a deposit on a real estate contract, and a counterclaim for failure to perform obligations required by the contract. The plaintiff, Julie Hipp, and the defendants, Dennis and Adele Fritz, entered into a contract on April 7, 1998, for the purchase of the home then owned by the CT Page 13019 defendants. The purchase price was $350,000.00; a mortgage contingency clause stated that the contract was contingent on the plaintiff's receiving financing in the amount of $280,000.00. Several days later, an amended contract was signed; the contingency clause in the amended contract stated that the contemplated financing was in the amount of $315,000.00. The plaintiff testified that she wanted the additional financing so that she would not have to sell as much stock. The contract indicated that the commitment was to be received within thirty days.
At the time Hipp requested the increased mortgage contingency, her real estate agent, Marilyn Rock of Calcagni Associates, referred her to Constitution Mortgage, a mortgage broker, for a "pre-qualification" letter. If a mortgage broker issued such a letter, which was not a commitment from a lender but rather a prediction from a broker that financing would be available in a certain amount, then the seller would be more likely to agree to the requested modification. Kevin Luddy, on behalf of Constitution, issued a pre-qualification letter on April 9, 1998, indicating that Hipp qualified for a loan in the amount of $315,000, subject to an appraisal, credit report, and verification of the information provided by the borrower. The defendants to agreed to the amendment regarding financing because of the assurance of the pre-qualification letter.
Although her agent apparently referred Hipp to Constitution, that informal reference was by no means binding; after the amended contract was signed, Hipp worked with Capstone Mortgage Company, another broker. She submitted her application on approximately April 15, 1998, and she arranged for the other items, such as inspection of the home, to be done. She was applying for an "80-10" loan, whereby the ten percent would be, in effect, a second mortgage. Based on a less than stellar credit report, North American, the mortgage company contacted by Capstone, sent to Capstone on approximately May 8, 1998, a denial of the application for the 80-10 On May 12, 1998, Capstone faxed to Hipp a commitment letter from North American, but only in the amount of $279,920. The closing was supposed to be held on May 15, and, though the method of counting the thirty days in which the commitment was to be obtained was not entirely clear to me, there was little dispute that the commitment in the lesser amount arrived at approximately the end of the thirty day period. Several witnesses testified that the communication arrived at the end of the thirty day period. CT Page 13020
When Hipp received the letter for financing in the lesser amount[1], she almost immediately contacted her agent and said that because the mortgage commitment was not what she anticipated, she was calling the contract off and requested the return of her deposit. Hipp had been in Europe on business from May 5 to May 11.
Tim Malburg, the co-owner of Capstone Mortgage, testified that the mortgage company he was dealing with, North American, apparently refused the $315,000 commitment because of features which appeared on Hipp's credit report. North American was willing to lend $280,000, or 80% of the price, however. Kevin Luddy, the president of Constitution Mortgage, testified that he had no contact with Hipp or her application during relevant times after the pre-qualification letter was prepared. He did testify, however, that he uses the same lenders as Capstone, so that Constitution would probably not have been able to secure 80-10 financing had Hipp applied through Constitution. He thought it was more likely than not,[2] however, that for a slightly greater monthly payment she would have been able to secure 90% financing, apparently despite the flaws in her credit report.
Because the news regarding the rejection of the requested financing arrived at the end of the thirty day period, Hipp attempted to cancel the contract. Had she not notified the sellers of the cancellation in a timely manner, she ran a risk of being liable under the contract.[3] There apparently were no immediate requests for an extension by either side, although Hipp apparently made an informal overture regarding the possibility of renting for a period of time prior to purchasing. Hipp did not pursue Constitution for a mortgage; she apparently did get in touch with Luddy after the relevant time period to satisfy her curiosity.
The defendants also presented testimony regarding their losses as a result of the nonperformance of the contract. These expenses included maintenance of the mortgage payments, household expenses, costs for storage of furniture and the like.
The plaintiff filed a complaint in two counts: the first count alleges a breach of contract and requests return of the deposit of $11,000; the second alleges a CUTPA violation. The defendants filed special defenses alleging that the plaintiff breached the implied covenant of good faith and fair dealing and CT Page 13021 that the plaintiff negligently failed to pursue financing and negligently breached an implied covenant of good faith and fair dealing. The defendants also filed a counterclaim for damages incurred when the plaintiff did not close.[4]
Both sides agree, it seems, on the legal standard to be applied to the plaintiff's efforts to secure financing. InPhillipe v. Thomas, 3 Conn. App. 471 (1985), the Appellate Court, in a decision by now Justice Borden, rejected the "good faith" standard and indicated that in Connecticut a buyer pursuant to the standard real estate agreement promises to "exert reasonable efforts to obtain a mortgage commitment." Id., at 473. The court distinguished the more subjective standard of good faith from the objective standards of reasonable diligence. "Reasonableness . . .is an objective standard, involving an analysis of what a person with ordinary prudence would do given the circumstances, without accounting for any particular knowledge or skill . . . (citations omitted). [T]he question is how would a person of ordinary prudence in such a situation have behaved, not how did the defendant in fact behave." Id., at 476. The court went on to note that the evidence underlying conclusions of reasonableness and good faith may well be related.
It is not disputed that Hipp pursued financing through Capstone with reasonable diligence. She applied soon after the contract was executed, and there was no evidence that anyone at Capstone told her that an 80-10-10 mortgage might not be approved but a 90-10 mortgage would have a better chance. In fact, there was no indication that the 80-10-10 mortgage would not be approved until Hipp was on a business trip to Europe. Perhaps most significantly, Constitution also used the same mortgage company: as the defendant's most persuasive argument is that the plaintiff should have at least pursued the broker which had prequalified her, there was little objective evidence that the result would have been different had Constitution been approached. The putative mortgagee would presumably have rejected the proposal that it rejected under Capstone submission; whether there would have been time to submit a second 90-10 proposal and indeed, whether the 90-10 itself would have been approved are matters which are somewhat speculative. In any event, there was no evidence that, when Hipp received the rejection of her proposal, anyone suggested to her that she could get a different result if she used another broker or altered her request for financing. Although it is true that Hipp did not exhaust every possibility, I find that she acted as an ordinarily prudent buyer CT Page 13022 would under the standard real estate contract. The defendants did not close when they had thought they would but, in the real world, that ought not to be overwhelmingly surprising. I find, then, that the plaintiff is entitled to return of the deposit of $11,000.
I do not find any violation of CUTPA; the second count is, then, not proved. Not only are the defendants not in the business of real estate selling, but I also find that there is no illegality or chicanery required by the "cigarette rule."
In light of the above findings, the special defenses and the counterclaim are found not proved. No relief other than return of the deposit, without interest, is awarded.
Beach, J.